IN THE COMMONWEALTH COURT OF PENNSYLVAIA

Todd Meyer, Patricia Rogers, : 
Gail Dwyer, Barry Ratliff, : 
Gwendolyn Ratliff, Douglas Durfey : 
and Maria Durfey, : 
    Appellants : 
     : 
     : 
    v. : No. 303 C.D. 2018
     : Argued:  October 15, 2018
     : 
City of Pittsburgh Historic : 
Review Commission, : 
City of Pittsburgh and : 
Heather Johnson : 

BEFORE:  HONORABLE MARY HANNAH LEAVITT, President Judge
     HONORABLE RENÉE COHN JUBELIRER, Judge
     HONORABLE ELLEN CEISLER, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT      FILED: January 7, 2019

    Todd Meyer, Patricia Rogers, Gail Dwyer, Barry Ratliff, Gwendolyn Ratliff, Douglas Durfey, and Maria Durfey (collectively, Objectors) appeal an order of the Court of Common Pleas of Allegheny County (trial court) that upheld the decision of the City of Pittsburgh's Historic Review Commission (Commission) to issue a certificate of appropriateness on a new home design proposed by Heather Johnson.  Objectors contend that the Commission erred and abused its discretion in concluding that Johnson's house was compatible with the surrounding row of historic homes.  We affirm.

**Background**

    Objectors own eight brick row houses on the 1400 block of Buena Vista Street that were constructed by Thomas Lemmon in the 1860s.  On November 14,

2016, Objectors nominated their row of homes, which they call "Lemmon Row,"[1] for an historical designation. On November 15, 2016, the Commission accepted Objectors' nomination. This acceptance meant that no alteration could be made to an existing home in Lemmon Row without the Commission's approval while it reviewed the merits of the historic designation nomination. Reproduced Record at 583a (R.R. __). On May 23, 2017, Lemmon Row was designated a historic district.

Johnson owns 1405 Buena Vista Street, the site of a house in Lemmon Row that was demolished in 2013. On November 18, 2016, Johnson applied to the Commission for a certificate of appropriateness for her proposed "[three] story single-family home [with one] integral garage" on the lot. R.R. 718a. Her application included architectural drawings. At a December 7, 2016, public meeting to consider Johnson's application, the Commission explained that because design guidelines had not yet been adopted for Lemmon Row, the Commission would

---

[1] In their application, Objectors described Thomas Lemmon as a skilled cabinet and furniture maker. Reproduced Record at 142a (R.R. ___). They further described that the row houses

> have a consistent and almost uniform cornice height of about 22' above the sidewalk. Each is entered by ascending 2 to 4 stone steps from the street level. These are two story homes. Only three of the homes (1403, 1405, and 1407) had accessible third floor storage rooms with small projecting east facing dormers each with one double hung window. Windows were apparently (judging by a few surviving originals) double hung, 2 over 2, counter weighted wood sash. The houses were built over basements. Typically there were two parlor rooms on the first floor and two sleeping rooms above. At some point frame additions were added to the rear but these additions typically lack basement spaces. Foundations were rubble stone with a belt coarse of dressed sandstone delineating the joining of foundation to brick masonry above.
>
> ***
>
> The row is constructed of common brick, laid by running bond, with simple shop made wood architectural ornamentation. The style is a mix of Italianate and simplified high Victorian.

R.R. 137a.

2

consider the guidelines for the adjacent Mexican War Streets Historic District[2] as "generally relevant." Meeting Minutes, 12/7/2016, at 187; R.R. 771a. The Commission further stated that Johnson's proposed building "do[es] not need to look like 1870s buildings." *Id.* at 181; R.R. 765a.

The Commission advised Johnson that her proposal needed to be "compatible with the historic character of the site and … take[ ] into account the size, proportion, façade composition, rhythm, proportions of openings, materials, [and] colors within the neighboring buildings." *Id.* at 183-84; R.R. 767a-68a. The Commission further advised that it would not approve a proposal that would "introduce new construction into a district that is visibly incompatible in terms of size, scale, design, materials, colors, textures, or destroys the historic relationship of the site, places parking in a location that could result in damage to historic site buildings or landscape features, [or] introduce an aluminum carport[.]" *Id.* at 184-85; R.R. 768a-69a.

Commissioner Ernie Hogan opined that "the biggest piece" of Johnson's proposal was the frontload garage and its window fenestration. *Id.* at 185; R.R. 769a. He suggested that the garage should have "some penetration of windows or some openings," and that her building must be "respectful of the rhythm and the components of the district." *Id.* at 186, 190; R.R. 770a, 774a.

Commissioner Raymond Gastil observed that because the neighboring homes are two stories, with "maybe a dormer," the height of Johnson's building presented "a challenge in some ways" but "[t]here are ways to address that." *Id.* at

---

[2] The Mexican War Streets are streets adjacent to Lemmon Row that are named after places and people from the Mexican-American War. The design guidelines for the Mexican War Streets Historic District "substantially incorporate the Secretary of the Interior's Standards for Rehabilitation and Guidelines for Rehabilitating Historic Buildings (revised 1983) as used to determine if rehabilitation projects qualify as 'certified rehabilitations[.]'" R.R. 168a.

3

188; R.R. 772a. Hogan suggested that Johnson's third floor be set back to conform to the roofline of the neighboring houses. *Id.* at 190; R.R. 774a. The Commission voted to postpone any action on Johnson's application until the next public meeting scheduled for February 1, 2017. Gastil encouraged Johnson to meet with him at the City's planning department to discuss her design.

At the February 1, 2017, public meeting, Johnson stated that as a result of guidance from Commissioner Gastil, she made the following changes to her proposal:

> The first change is the change in the roofline from slanted to flat to match the other homes in the neighborhood…. [T]hey [sic] also changed the façade materials from wood and cement board to wood only to match other historic homes in the Northside, and they [sic] changed the window arrangement to match the house next door. The stair count was also changed to match the neighbors'. They [sic] have taken the height of the house down from 40 feet to 35 feet so it will match the height and shape of the neighbors', and they [sic] have brought the height of the garage door up to match the line of the neighbors' windows, and have changed the material of the garage from aluminum to wood. They [sic] have also added a transom above the front entry door. The biggest change is that they [sic] have set the third story back to create a break and to match the neighbors' cornice…. [A]ll of the colors will be neutral. She has tried to respond to what her neighbors would like to see in the neighborhood.

Meeting Minutes, 2/1/2017, ¶1; R.R. 808a. Johnson stated that her architect had given "great consideration [to] the scale and height as well as context, the flow of the houses, sight lines, and size, shape, and material of the houses in the row, across the street, and throughout the Northside." *Id.*

Objectors objected to Johnson's proposal. Meyer stated that the owners of the homes on Lemmon Row have "informally adopted" the Mexican War Streets Historic District guidelines; Johnson's design does not follow any of the criteria set

4

forth therein and "will irreversibly destroy the historic row." *Id*., ¶11; R.R. 809a. Durfey stated that he "feels that this row is unique in that it has the same character and level of detail from one end to the other." *Id*., ¶12; R.R. 809a. Dwyer stated that Johnson's "proposal does not fit into the historic row." *Id*., ¶13; R.R. 809a.

At the conclusion of the February 1, 2017, meeting, the Commission voted to issue Johnson a certificate of appropriateness with conditions.[3] The Commission explained that the goal "is not to do a historic reproduction but to respond to the historic district." *Id*., ¶18; R.R. 810a. The Commission further explained that because Lemmon Row had not yet been granted historical status, it was not subject to formal guidelines. Accordingly, the Commission used the United States Department of Interior's standards for guidance:

> [P]ortions of the guidelines refer to the Department of the Interior's standards, which are pretty clear that additions and new construction should not try to mimic historic fabric…. [T]he guidelines indicate that the size, plane, and window arrangement should be the same so that the building is in harmony with the neighborhood without trying to match the demolished building exactly…. [T]he historic nature of Lemmon Row is valued by the Commission, but at the same time there are a lot of "missing teeth" in the historic neighborhoods and they need to think about how to encourage infill housing with a variation of architectural expression within the guidelines, in order to create neighborhoods of diversity.

*Id.,* ¶19; R.R. 810a.

---

[3] The Commission approved Johnson's new construction provided that "the second floor right window is to match the second floor left side window; the garage should have nine panel openings to match instead of six panel openings; and final colors shall be submitted to staff for approval." Meeting Minutes, 2/1/2017, Motion ¶1; R.R. 811a. Johnson agreed to make those changes.

5

## Trial Court Decision

Objectors appealed to the trial court on March 1, 2017, and the City intervened. Oral argument was held on October 16, 2017; no new evidence was presented. Objectors challenged the Commission's use of the U.S. Department of Interior guidelines, asserting that they had been assured that the design guidelines adopted for the Mexican War Streets Historic District would be used for Lemmon Row. In any event, the Commission did not even follow the Department of Interior guidelines. Objectors further argued that the Commission denied them due process by failing to give them the time needed to draft design guidelines for Lemmon Row.

By order of November 15, 2017, the trial court affirmed the Commission's decision. The trial court observed that Sections 1101.02(g) and 1101.07(b) of the Pittsburgh Zoning Code,[4] which relate to historic preservation, authorize the Commission to develop guidelines for a historic district. In the absence of adopted guidelines, the Commission must be guided by the "Secretary of the Interior's Standards for Rehabilitation." Trial Court op. at 3 (citing TITLE XI §§1101.02(g) and 1101.07(b)). At the time the Commission voted on Johnson's plan, Lemmon Row had not been granted historical status[5] and the Commission had not adopted guidelines. Accordingly, the Commission appropriately relied on the Department of Interior guidelines. The trial court rejected Objectors' argument that Johnson's plan did not satisfy the Department of Interior guidelines, which discourage construction that seeks to "mimic the historic property exactly." Trial

---

[4] CITY OF PITTSBURGH ZONING CODE, Title 11, added by Ordinance No. 25 of 1997 (Title XI).

[5] During the February 1, 2017, public meeting, the Commission voted to recommend that City Council create a Lemmon Row Historic District. R.R. 213a. Lemmon Row was designated a historic district on May 23, 2017, after the Commission had issued the certificate of appropriateness to Johnson.

6

Court op. at 6. The trial court further held that Objectors were present at the public meetings and, thus, were not deprived due process.

## Appeal

On appeal,[6] Objectors present four issues for our consideration, which we consolidate into three for clarity. Objectors first argue that the Commission erred in issuing Johnson the certificate of appropriateness on the basis of the U.S. Department of Interior guidelines. Second, Objectors argue that they were denied due process because the Commission did not give Objectors time to draft guidelines specific to the Lemmon Row Historic District. Finally, Objectors argue that the Commission failed to provide an adequate rationale for its decision in a written report. Objectors urge this Court to vacate the trial court's order and remand the matter for further fact-finding.

## I. Certificate of Appropriateness

In their first issue, Objectors argue that the Commission erred in using the Department of Interior guidelines but, even so, did not properly apply those guidelines to Johnson's design. Objectors contend that the size, plane, and window arrangement of Johnson's house are not the same as those of other Lemmon Row homes.

Specifically, Lemmon Row consists of homes of two stories; Johnson's home is three stories. Lemmon Row homes are on the same plane with the first story containing a front door two steps from the sidewalk, windows on the first floor are

---

[6] The standard of review in an appeal of a local agency decision, where the trial court has taken no additional evidence, is whether constitutional rights have been violated, whether an error of law has been committed, or whether a finding of fact of the agency necessary to support its adjudication is not supported by substantial evidence. *Tegzes v. Township of Bristol*, 472 A.2d 1386 (Pa. 1984).

the same height as the door, and all second floor windows are symmetrically above the door and the first floor windows. Johnson's front door is recessed from the plane of the façade, and the first floor windows are not the same plane or the same height. The garage door has mini-windows; the upper floor windows are not symmetrical and at least one is not on the same plane. Some of the windows are not the same size. The window arrangement is not the same as that of other Lemmon Row homes. Stated otherwise, Objectors argue that Johnson did not demonstrate that her house is compatible with the "exquisite architectural style of Italianate and Simple Victorian" homes in Lemmon Row with "commonality of scale, material, and finish." Objectors' Brief at 3.

The City responds that Objectors mischaracterize the Department of Interior guidelines, which discourage new construction that attempts to replicate existing buildings. Rather, the guidelines provide only that "new work shall be *compatible* with the massing, size, scale, and architectural features," and Johnson's design did so. City Brief at 8 (emphasis in original). The City argues that the Commission exercised its discretion appropriately.[7]

---

[7] The City also argues that Objectors' appeal is moot because, according to the City, Johnson has already built her house. Generally, a case will be dismissed as moot where there exists no actual case or controversy. *Mistich v. Pennsylvania Board of Probation and Parole*, 863 A.2d 116, 119 (Pa. Cmwlth. 2004). A controversy must continue through all stages of judicial proceedings, trial and appellate, and the parties must continue to have a "personal stake in the outcome" of the lawsuit. *Id.* Courts will not enter judgments or decrees to which no effect can be given. *Id.*

Here, the Commission granted Johnson the certificate of appropriateness on February 1, 2017. On March 1, 2017, Objectors appealed the Commission's decision to the trial court and subsequently filed an Emergency Motion for Special Relief, seeking to enjoin and restrain Johnson "until hearing from beginning to build or continuing to build her design or conducting any construction activity at 1405 Buena Vista Street." R.R. 130a. By order dated July 12, 2017, the trial court denied Objectors' motion. R.R. 535a.

If Johnson has already built her house as the City alleges, a reversal of the trial court's decision can have no effect unless Johnson can be required to demolish her house and rebuild it

8

Section 1101.03(c) of Title XI of the Zoning Code provides, in pertinent part, as follows:

> (c)   Effects of nomination to the Historic Review Commission.
>
> > (1)a. *No exterior alterations, as defined in § 1101.02(e) shall be undertaken upon a nominated structure, or a structure located within a nominated district*, or a nominated site or object, beginning two (2) business days after mailing of the notice of nomination by the Commission until a final determination about the designation has been made by Council, or until the elapse of one hundred twenty (120) days after Council's receipt of the Historic Review Commission and Planning Commission's recommendations, *without the review and approval by the Historic Review Commission and the issuance of a Certificate of Appropriateness…*.

TITLE XI §1101.03(c); R.R. 924a (emphasis added).  Section 1101.02(g) of Title XI further states as follows:

> GUIDELINES FOR THE ISSUANCE OF CERTIFICATES OF APPROPRIATENESS FOR REHABILITATION AND NEW CONSTRUCTION IN HISTORIC DISTRICTS.  Guidelines which establish standards which the Commission can utilize in determining the appropriateness of applications.  *The Commission shall use the Secretary of the Interior's Standards for Rehabilitation after a property is nominated for historic designation, until it develops guidelines specifically for a structure, district, site, or object, with recommendations from the community.*  These Guidelines cover the treatment of all work requiring a building, demolition, or sign permit, and may cover non-permit projects as defined under Exterior Alteration.  The

---

should the certificate be revoked.  The record does not establish, however, whether Johnson has completed the construction.  The City did not raise the issue of mootness before the trial court, nor has it filed an application to dismiss Objectors' appeal as moot.  Therefore, we do not address the issue of mootness.

9

Guidelines may be amended from time to time upon affirmative resolution of the Historic Review Commission.

TITLE XI §1101.02(g); R.R. 923a (emphasis added).

Here, Johnson applied for a certificate of appropriateness for new construction after Lemmon Row was nominated to be a historic district. At all times relevant hereto, the Commission had not yet developed guidelines for Lemmon Row. Thus, the Commission's use of the Department of Interior's standards to evaluate Johnson's application conformed to Section 1101.02(g) of Title XI of the Zoning Code. We reject Objectors' challenge to the Commission's use of the federal guidelines.

Objectors contend, alternatively, that Johnson's design did not comply with the Department of Interior's standards, which provide in pertinent part:

2003.4. The Secretary's Standards are:

(i) Standard 9: New additions, exterior alterations, or related new construction shall not destroy historic materials that characterize the property. *The new work shall be differentiated from the old and shall be compatible with the massing, size, scale and architectural features to protect the historic integrity of the property and its environment.*

(j) Standard 10: New additions and adjacent or related new construction shall be undertaken in such a manner that if removed in the future, the essential form and integrity of the historic property and its environment would be unimpaired.

10-C DCMR §2003.4, R.R. 935a-36a; *see also* 36 C.F.R. §67.7(b)(9)-(10) (emphasis added). It is undisputed that the physical appearance of Johnson's house is "differentiated from the old" Lemmon Row homes. 36 C.F.R. §67.7(b)(9). The relevant inquiry is whether Johnson's house is "compatible with the massing, size,

10

scale and architectural features" of the surrounding properties. 36 C.F.R. §67.7(b)(9).

Objectors interpret the Department of Interior's standards to mean that "the new construction can be different from the original construction *but for* massing, size, scale, and architectural features." Objectors' Brief at 11 (emphasis in original). Stated otherwise, Objectors construe the term "compatible" to require architectural features identical to the existing historic homes.

Neither the Department of Interior nor the Zoning Code has defined the term "compatible" or "compatibility." The dictionary defines "compatible" to mean "capable of existing together in harmony." MERRIAM-WEBSTER COLLEGIATE DICTIONARY 234 (10th ed. 2001). Objectors' interpretation ignores the ordinary meaning of "compatible."

The Commission closely reviewed the compatibility of Johnson's house with the existing Lemmon Row homes. At the December 7, 2016, public meeting, the Commission explained that it considered "size, proportion, façade composition, rhythm, proportions of openings, materials, [and] colors" in determining compatibility. Meeting Minutes, 12/7/2016, at 183-84; R.R. 767a-68a. The Commission suggested that Johnson redesign the window fenestration to be "respectful of the rhythm and the components of the district." *Id.* at 190; R.R. 774a. The Commission also expressed concern about the height of Johnson's three-story building because the neighboring homes are all two stories.

In response, Johnson modified her design to revise, among other things, "the window arrangement to match the house next door." Meeting Minutes, 2/1/2017, ¶1; R.R. 808a. The new design also "[took] the height of the house down from 40 feet to 35 feet so it will match the height and shape of the neighbors'

11

[properties]." *Id.* Further, Johnson "set the third story back to create a break and to match the neighbors' cornice." *Id.* After Johnson made these changes, the Commission voted unanimously in favor of issuing the certificate of appropriateness.

Title XI of the Zoning Code was enacted to "preserve and restore the qualities of the [City] relating to its history, culture, and tradition" and the "harmonious outward appearance of structures[.]" TITLE XI §1101.01(b). It empowers the Commission to designate buildings as historic and to approve or deny certificates of appropriateness for construction and renovation within historic districts. *Id.*, §§1101.02(g) and 1101.03(c). Title XI specifies that Commission members include one professional preservationist or an architectural historian; one architect; three members from the Department of City Planning, the Bureau of Building Inspection, and the Board of Realtors; and two citizen members "who have demonstrated an outstanding interest and/or knowledge of historic preservation and restoration." TITLE XI §1101.07(a). Given the Commission's collective expertise, the trial court held that its determination on whether new construction was compatible with a historic district was a decision entitled to deference. We agree.

In *Turchi v. Philadelphia Board of License and Inspection Review*, 20 A.3d 586 (Pa. Cmwlth. 2011), landowners sought review of a decision of the Philadelphia Board of License and Inspection Review, which reversed the decision of the Philadelphia Historical Commission to issue a permit for the renovation of a historically designated building. The trial court affirmed the board's decision, and we reversed. In so doing, we emphasized that "an administrative agency's interpretation of the statute it is charged to administer is entitled to deference on appellate review absent 'fraud, bad faith, abuse of discretion, or clearly arbitrary

12

action.'" *Id.* at 591 (citing *Winslow-Quattlebaum v. Maryland Insurance Group*, 752 A.2d 878, 881 (Pa. 2000)). The historical commission, composed of members with expertise in historic preservation, was charged with administering the historic preservation ordinance. *Id.* at 593. We held that the historical commission's interpretation of the ordinance was entitled to deference. *Id.* at 595.

Likewise, here, the Commission's interpretation of the term "compatibility," absent fraud, bad faith, or abuse of discretion, is entitled to deference on appellate review. The trial court did not err in affirming the Commission's exercise of discretion in issuing a certificate of appropriateness to Johnson.

## II. Due Process

Objectors argue, next, that they were denied due process because the Commission used the Department of Interior guidelines. Objectors contend that because Johnson's new construction constitutes a "significant deviation in height from the existing houses on Lemmon Row," their property rights have been diminished without due process of law. Objectors' Brief at 15.

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, §1. Our Supreme Court has held that due process of law is also guaranteed by Article I, Sections 1, 9, and 11 of the Pennsylvania Constitution. *Lyness v. State Board of Medicine*, 605 A.2d 1204, 1207 (Pa. 1992). The due process standards of the United States and Pennsylvania Constitutions are essentially the same. *Muscarella v. Commonwealth*, 87 A.3d 966, 973 (Pa. Cmwlth. 2014). The basic elements of procedural due process are "adequate notice, the opportunity to be heard, and the chance to defend oneself

13

before a fair and impartial tribunal having jurisdiction over the case." *Commonwealth v. Turner*, 80 A.3d 754, 764 (Pa. 2013). Courts examine procedural due process in two steps: "the first asks whether there is a life, liberty, or property interest that the state has interfered with; and the second examines whether the procedures attendant to that deprivation were constitutionally sufficient." *Id.*

Objectors contend that by using the Department of Interior guidelines to review Johnson's design, the Commission violated their due process rights. However, Objectors do not identify, with any particularity, how the procedures afforded to them before the Commission were insufficient. Objectors cite several zoning cases involving nonconforming uses and variances, *e.g.*, *O'Neill v. Zoning Board of Adjustment of Philadelphia County*, 254 A.2d 12 (Pa. 1969), *Keebler v. Zoning Board of Adjustment of City of Pittsburgh*, 998 A.2d 670 (Pa. Cmwlth. 2010), but they do not explain how these cases advance their due process claim.

Article III of the Commission Rules of Procedure, entitled "Procedures of Applications and Hearings," provides, in pertinent part:

> [Section] 308. The applicant, upon recognition by the presiding officer, shall be allowed to explain the application and shall answer the questions of the Commission members. The presiding officer shall then allow proponents of the proposal to speak, upon recognition. A period of three (3) minutes shall be allowed for all proponents. The presiding officer shall then allow opponents of the proposal or other interested parties to speak and question the petitioner, upon recognition. A period of three (3) minutes shall be allowed for all such speakers.

R.R. 819a. The record shows that Johnson presented her modified building plan at the February 1, 2017, public meeting of the Commission. Objectors were present at that meeting and voiced objections to Johnson's plan. Objectors do not dispute that

14

they were given adequate notice or the opportunity to be heard during the public meeting.

Before the trial court, Objectors argued that the Commission denied them due process because they were not given sufficient time to draft design guidelines for Lemmon Row. This claim also lacks merit. The Zoning Code requires the Commission to seek recommendations on guidelines from residents in a proposed historic district, but it is the Commission, not residents, that is responsible for the guidelines. TITLE XI §§1101.02(g), 1101.07(b); R.R. 923a, 932a. It is immaterial that Objectors were not given more time to draft guidelines for Lemmon Row for the Commission's consideration.

In summary, Objectors failed to show that the Commission interfered with their life, liberty, or property interests, or that the procedures afforded to them before the Commission were insufficient. The trial court correctly held that Objectors were not denied due process.

### III. Rationale for Commission Decision

Finally, Objectors argue that the Commission erred by not issuing a written report with its findings of fact and an explanation therefor. Objectors argue that because the Commission did not adequately address the Department of Interior guidelines, the record is incomplete. Thus, the trial court erred by not taking additional evidence. Objectors' Brief at 22.

The Local Agency Law[8] states, in relevant part, as follows:

> (a) Incomplete record.--In the event a full and complete record of the proceedings before the local agency was not made, the court may hear the appeal de novo, or may remand the proceedings to the agency for the purpose of making a full and

---

[8] 2 Pa. C.S. §§551-555, 751-754.

complete record or for further disposition in accordance with the order of the court.

(b)  Complete record.--In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency. After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. If the adjudication is not affirmed, the court may enter any order authorized by 42 Pa. C.S. § 706 (relating to disposition of appeals).

2 Pa. C.S. §754.  A "full and complete record" is defined as "a complete and accurate record of the testimony taken so that the appellant is given a base upon which he may appeal and, also, that the appellate court is given a sufficient record upon which to rule on the questions presented."  *In re Thompson*, 896 A.2d 659, 668 (Pa. Cmwlth. 2006).

First, Objectors did not argue to the trial court that the record was incomplete or that they were not "given a base upon which [they] may appeal." *Id.* As such, the issue is waived.  Pa. R.A.P. 302. ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").  Second, the record includes the transcripts of the two public meetings held before the Commission; Johnson's application for the certificate of appropriateness; and her architectural drawings.  Objectors' argument that the record is incomplete lacks merit.

Objectors also cite Section 1101.06(g) of Title XI, which provides "[t]he determination [of the Commission] shall be accompanied by findings of fact and a report stating the reasons for the decision."  Objectors' Brief at 20 (citing TITLE

16

XI §1101.06(g); R.R. 931a). Their reliance on Section 1101.06(g) is misplaced because it relates only to the Commission's review process for a certificate of economic hardship. This case involves issuance of a certificate of appropriateness, not a certificate of economic hardship. Title XI does not require the Commission to issue a written decision when it issues a certificate of appropriateness.

## Conclusion

Objectors did not demonstrate that the Commission abused its discretion in issuing a certificate of appropriateness to Johnson. Objectors' claim that they were denied due process because they were not given enough time to propose guidelines for Lemmon Row lacks merit because the guidelines, if any, are the responsibility of the Commission, not interested citizens. Objectors' argument that the Commission did not provide an adequate rationale for its decision is waived because it was not raised before the trial court and, in any case, lacks merit.

For these reasons, we affirm the trial court's November 15, 2017, order.

_____
MARY HANNAH LEAVITT, President Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVAIA

Todd Meyer, Patricia Rogers,                     :
Gail Dwyer, Barry Ratliff,                       :
Gwendolyn Ratliff, Douglas Durfey               :
and Maria Durfey,                                :
           Appellants                      :
                                           :
          v.                               : No. 303 C.D. 2018
                                           :
City of Pittsburgh Historic                      :
Review Commission,                               :
City of Pittsburgh and                           :
Heather Johnson                                  :

# **O R D E R**

AND NOW, this 7th day of January, 2019, the order of the Court of Common Pleas of Allegheny County dated November 15, 2017, in the above-captioned matter is AFFIRMED.

                       _____

                       MARY HANNAH LEAVITT, President Judge